COMMERCIAL CREDIT CO., Respondent, *v.* O'BRIEN, COUNTY TREASURER, et al., Appellants.

(No. 8343.)

(Submitted April 6, 1943. Decided October 7, 1943.)

[146 Pac. (2d) 637.]

*Mr. R. V. Bottomly,* Attorney General, *Mr. I. W. Choate,* Counsel for the State Board of Equalization, *Mr. Frank J. Roe,*

County Attorney for Silver Bow County, and *Mr. P. E. Geagan,* City Attorney for the City of Butte, for Appellants, submitted a brief; *Mr. Choate* argued the cause orally.

*Mr. R. F. Gaines,* for Respondent,

*Messrs. Weir, Clift & Bennett,* and *Messrs. Poore & Poore,* jointly with *Mr. Gaines,*

MR. JUSTICE ADAIR delivered the opinion of the court.

This is an appeal by the county of Silver Bow, the city of Butte and the treasurer of each, from an adverse judgment in an action instituted by Commercial Credit Company, a corporation, to perpetually enjoin the said county, city and their tax gathering officers from collecting an *ad valorem* tax levied on credits and receivables valued by the county assessor of said county at $574,-735 and assessed, as of the first Monday in March, 1937, as the property of Commercial Credit Company.

The tax has not been paid and the district court, by judgment and order, has perpetually enjoined the defendants county of Silver Bow, city of Butte and the respective treasurers of each ▮ from collecting the tax. As is correctly said in *Miami Coal Co.* v. *Fox,* 203 Ind. 99, 176 N. E. 11, 13, 79 A. L. R. 333, where as here the plaintiff "admits by stipulation that it has not paid the tax cast against the assessed valuation of the property, to prevail in its suit to enjoin the collection of the tax, it must show by allegation and proof that the property upon which the tax is assessed is not subject to taxation."

The plaintiff Commercial Credit Company contends that the ▮ assessor has assessed the property against the wrong Commercial Credit Company; that while the plaintiff Commercial Credit Company originally purchased, owned and held all of the receivables so found by the assessor, yet plaintiff had divested itself of its title and ownership before the first Monday in March, 1937, by assigning and transferring same under a "contract" to

another Commercial Credit Company that owns *all* the stock of the plaintiff Commercial Credit Company; that the assignee Commercial Credit Company cannot be taxed with the property because it does no business in Montana and that the plaintiff or assignor Commercial Credit Company cannot be taxed with the property because it had assigned the intangibles before the first Monday in March, 1937.

In other words, plaintiff Commercial Credit Company contends that on the first Monday in March, 1937, it did not own these receivables but that they were then owned by the Commercial Credit Company that owns plaintiff and *all* plaintiff's stock.

Commercial Credit Company is the confusing, confounding and identical name employed by both the plaintiff and its alleged transferee who are engaged in precisely the same business. The business consists of financing the sale of manufactured products, principally motor vehicles and refrigerators, (1) from manufacturers to distributors and dealers and (2) from these to the ultimate consumer. Lien obligations given by the purchasers of the motor vehicles or refrigerators are bought from dealers, who are required to execute a full or limited guaranty of the credit or obligation or a repurchase agreement.

The alleged assignee Commercial Credit Company was, on May 29, 1912, organized as a corporation under the laws of the state of Delaware. As of December 31, 1936, its assets totaled $252,088,254.37, of which amount, $183,481,689.92 was in notes and accounts receivable.

The plaintiff or assignor Commercial Credit Company was, on June 6, 1931, organized as a corporation under the laws of the state of Montana. It has an authorized capital stock of only $5,000 and a surplus of only $6,174.17. *All of assignor's stock is owned by the assignee Commercial Credit Company* so incorporated under the laws of Delaware. The plaintiff assignor has continuously engaged in business in Montana since its incorporation and for each of the years 1932, 1933, 1934, 1935, 1936 and 1937, it has annually earned net profits in varying amounts.

Over three millions of dollars were, from March 1, 1936, to February 28, 1937, collected by the plaintiff Commercial Credit Company in Montana from makers, signers and guarantors of conditional contracts of sale, promissory notes and trust receipts executed in Montana and here delivered to plaintiff in connection with the financing by it of sales made in Montana of motor vehicles, refrigerators, etc., to consumers, dealers and distributors in Montana. $2,753,350 of the collections so made in Montana during such period was by plaintiff sent out of this state being remitted, in cash, to the assignee Commercial Credit Company. The vast amount so remitted was in addition to collections of $197,729.93 for which the assignor Commercial Credit Company gave the assignee Commercial Credit Company credit on account of the assignee's indebtedness to the assignor.

The plaintiff Commercial Credit Company submitted to the county assessor of Silver Bow county a list, under oath, which purports to correctly set forth "all merchandise, furniture and fixtures, solvent credits, money, credits, bonds, securities, warrants and all personal property in its possession at 12 o'clock noon on the first Monday in March, 1937." The only property therein listed is cash on hand $100; cash in bank $434.11; accounts receivable automobiles $33,201.98; other solvent credits $2,272.99 and furniture and fixtures $225. Plaintiff for the year 1937 paid taxes only on the property so listed by it of $109.98 to the city treasurer of Butte and $190.54 to the county treasurer of Silver Bow county.

It is represented that the plaintiff Commercial Credit Company on January 2, 1934, entered into a "contract" with the assignee Commercial Credit Company for the sale of plaintiff's receivables at a rate of discount therein stated, the "contract" providing that:

"Due to the seasonal variation of charges of Montana Company to dealers in respect to Notes and Contracts arising out of the sale of wholesale to dealers of Motor vehicles and other forms of merchandise, it is hereby agreed that the parties hereto, from month to month or at such other period as may be agreed upon,

will mutually determine and agree upon the rate of discount under which Delaware Company will purchase wholesale Notes and Contracts from Montana Company. * * *

"Montana Company agrees to endorse and assign Notes and Contracts to Delaware Company in form and manner satisfactory to Delaware Company and Montana Company does hereby guarantee payment of Notes and Contracts in accordance with the terms thereof, provided however, that Delaware Company agrees that a loss of Montana Company by reason of its guarantee of Notes and Contracts shall not exceed Two Percent (2%) of the face amount of Notes and Contracts purchased hereunder by Delaware Company during any calendar year, commencing with the date hereof. All losses shall be considered in connection with the year during which the Notes and Contracts out of which such losses arose, were purchased, irrespective of when such losses may accrue. Montana Company shall submit to Delaware Company, for purchase under this Agreement, on or about the first (1st) day of each month, the Notes and Contracts purchased by it during the month immediately preceding such settlement date. Notes and Contracts shall be listed upon and attached to schedules in such form as may be agreed upon by the parties hereto. * * *

"If, in the course of collection or liquidation of any Note and/or Contract purchased by Delaware Company hereunder, in the judgment of Montana Company it becomes necessary to resort to legal action for the enforcement of such a Note and/or Contract, Montana Company agrees to purchase from Delaware Company forthwith such Note and/or Contract for the full amount unpaid and owing thereon.

"Montana Company covenants and agrees that it will use its best efforts in the interest of Delaware Company in effecting collection and liquidation of the Notes and Contracts purchased hereunder, but Montana Company shall in no way be responsible or liable for its failure or inability to effect such collections, except as expressly provided herein. On or about the first (1st) day of each month, Montana Company will notify Delaware

Company as to Notes maturing during the preceding month upon which it has been unable to effect collection.''

Plaintiff represents that pursuant to the above ''contract'' and immediately upon purchasing in Montana conditional sales contracts, notes and trust receipts, such ''Receivables are transferred and delivered by the Montana Company to the Delaware Company *by listing the same on schedules* giving the name of the maker, the payer, the amount of each receivable, and the number of installments in which each is payable *by shipping daily or several times each week such schedules* to the Delaware Company at San Francisco, California, pursuant to Exhibits 1, 2, 3, 4 and 5.''

By this prompt and speedy shipping of such schedules and lists of receivables out of the state of Montana the plaintiff contends it absolutely divested itself of ownership of all the receivables and credits so listed on such schedules. Notwithstanding these alleged ''daily sales'' of its solvent credits the plaintiff Commercial Credit Company continues to receive, in Montana, all the remittances and collections on such receivables, so claimed to have been ''sold'' by it and, after receiving such collections it either remits the full amount thereof to the parent assignee Commercial Credit Company or, it remits part thereof and credits the balance or all on amounts owing by the parent company to the plaintiff. When a contract or note is fully paid it is the plaintiff company, in Montana and not the assignee company, that delivers same to the dealer or maker from whom it was acquired in Montana. .

Exhibits 4 and 5 are identically worded letters (except as to dates and percentage) written by the parent company from its home office in Baltimore, Maryland, to the plaintiff company at Butte, Montana, and by the latter accepted. Exhibit 4 recites: ''Gentlemen:

''The contract between us, dated January 2, 1934, covering the rediscounting of receivables acquired by you, provides for adjustment from time to time of the rates in respect to the rediscounting of wholesale receivables.

"After giving consideration to current money rates and the probable volume of this type of business which will be handled, we are willing to purchase wholesale receivables which you may acquire, commencing January 2, 1937, at the actual cost of acquisition thereof to you, plus One-twentieth of One Percent (1/20 of 1%) thereof. This rate is effective from January 2, 1937, but we reserve the right to cancel this arrangement at any time upon Ten (10) days notice in writing.

"If this arrangement is satisfactory to you, please execute the acceptance of this proposal hereon, returning this letter to us. A copy is enclosed for your file."

Thus does the plaintiff company apparently invest its money in Montana in a business that involves an annual turnover of over three millions of dollars and which volume of business it is content to deliver over to the assignee company "at the actual cost of acquisition * * * plus One-twentieth of One Percent (1/20 of 1%) thereof."

In conducting its business in Montana the plaintiff uses certain printed forms of Conditional Sale Contract, Industrial Conditional Sale Contract, Trust Receipt for Motor Vehicles and Trust Receipt Industrial. The conditional sale contract, Exhibit 6, used by plaintiff, is executed by the purchaser in Montana in triplicate; one copy is delivered to the purchaser, one copy is permanently filed in the office of the registrar of motor vehicles at the Montana state prison, pursuant to Chapter 72 of the Laws of 1937, if the sale be of a motor vehicle and, if the sale be of a refrigerator or chattel other than a motor vehicle, then the contract is permanently filed in the office of the county clerk of the county in which the property has its *situs*, pursuant to section 7594, Revised Codes of 1935, and the third copy of the contract is sent to the plaintiff in whom is reserved the title to the described property until the contract has been fully paid.

Of course the contract which is delivered to the registrar of motor vehicles never goes to Delaware, to Maryland or to San Francisco. In fact it never leaves Montana but remains at all times in the custody of the warden of the Montana state prison

who acts as registrar of motor vehicles. Likewise the contract which is filed in the office of the county clerk and recorder never leaves the state of Montana but permanently remains on file in said office irrespective of subsequent assignments or transfers of interest in such contract. Also, the copy of the contract retained by the purchaser remains in his possession in this state. Thus the only one of the three executed copies of the conditional sale contract which plaintiff could send out of Montana would be the unfiled third copy delivered to it for its office record.

The name Commercial Credit Company appears in a number of places throughout the conditional sale contract but the name as used therein is vague, general and indefinite and would apply equally to the plaintiff Commercial Credit Company as to the parent Commercial Credit Company. Furthermore there is no designation therein of the home office or principal place of business or state of incorporation of the Commercial Credit Company mentioned.

In the contract the purchaser agrees to pay the specified installments each month "at the office of Commercial Credit Company, with interest thereon after maturity at the highest rate permitted by law." But again is omitted the place, the city, the state or any other designation of the location of "the office of Commercial Credit Company" and again the vague, general and indefinite designation of the payee will fit equally well the "Delaware Company" or "Montana Company" or numerous subsidiaries, off-shoots and affiliates of the parent company, operating under the name Commercial Credit Company.

In the Industrial Conditional Sale Contract form which plaintiff uses in Montana the dealer is required to execute an assignment of all his title in the contract and in the chattels described therein with power to take legal proceedings in his name "to one of the following Commercial Credit Companies, its successors or assigns: Commercial Credit Company, Commercial Credit Company, Inc., Commercial Credit Corporation or Commercial Acceptance Company, the assignee being the company which pays" the assignor "the consideration of this assignment."

The record does not disclose the execution or delivery of any formal assignments of the contracts "sold" to the parent company nor that any such assignments to the parent company were filed in the offices of the registrar of motor vehicles or of the various county clerks and recorders where are filed the original contracts. Apparently there is nothing of record indicating the alleged assignment and transfer of interest to the parent company of the title to the motor vehicles and chattels covered by such contracts as is required by statute.

Again, upon the final payment of the conditional sales contract the owner thereof is required by law to file a proper satisfaction and to surrender the certificate of ownership to the purchaser. There is no evidence in the record that the parent company, being the alleged owner of the contract, performed any of such duties to purchasers in this state. The record shows that all such duties were performed by the plaintiff company. In this plaintiff acted either for itself or as the agent of the parent Delaware Company. (*Commercial Credit Co.* v. *Blair*, 84 Mont. 314, 275 Pac. 748.) In other words, in complying with the Montana statute upon the final payment of the conditional sales contracts some one "does business" in this state and that someone is either the parent company as alleged owner of the receivables or the plaintiff company as the agent and *alter ego* of the parent company and these receivables so owned and habitually employed in this business in Montana most certainly have a business *situs* in this state for taxation purposes irrespective of whether owned by the plaintiff Commercial Credit Company or by the parent Commercial Credit Company.

By designedly employing the identical name of Commercial Credit Company as well as other similar sounding names for various subsidiaries owned and controlled by the parent company, has the parent company, for reasons of its own, rather thoroughly scrambled its transactions, affairs, business and property.

So effective has been this scrambling process that from the big business omelette which it has mixed through the years it

210

becomes most difficult for an outsider to now separate the broken egg hatched in Montana, whence comes into the parent company's coffers a golden stream of more than three millions of dollars annually to be mixed in the same dish with broken eggs that were hatched in Delaware (where was incorporated the parent company); in Maryland (where the parent has its home office) and in California where are sent the schedules and lists of the daily business done by the plaintiff in Montana.

It is not the function nor the duty of the public officers █ charged with the duty of making assessments and collecting the taxes to unscramble the eggs which Commercial Credit Company has so thoroughly scrambled. By their operations and conduct have the Commercial Credit Companies effected a merger of their identity and, for the purpose of levying and collecting the taxes due on the intangible personal property regularly and habitually used and employed in their business in Montana, it is entirely unnecessary for us to trace the various transactions through the books kept by the companies nor are we bound by whether the transactions be listed therein as sales, pledges, or merely transfers. · The jurisdiction of Montana to levy and collect a tax on intangibles which have a business *situs* in this state is not to be determined by the bookkeeping methods of either the owner or user of such intangibles in the state.

The taxing officers of this state are annually entitled to know the exact identity, kind, amount and value of all property "owned or used by," (sec. 7, Art. XII, Const.) Commercial Credit Company in this state in the business in which it has been regularly and continuously engaged for a long period of years.

The parent or foreign Commercial Credit Company owns *all* █ of the stock of the domestic or plaintiff Commercial Credit Company and, owning *all* of such stock the big parent company controls, dominates and directs *all* the affairs of its little child, the Montana company. The business forms which the domestic company uses, its bookkeeping methods and practices, in fact all its business activities are dictated by its owner and parent.

Under such circumstances when the parent company assumed

to enter into a "contract" with the plaintiff it was merely attempting to contract with itself. The parent was certainly in a position to dictate its own terms when contracting with a contractor which it owns. Such a "contract" is no contract at all for we must recognize the legal principle that in order to make an express contract, there must be the assent of two separate independent minds; that no man can effectually make a contract with himself.

In the instant case we have but one independent mind, and that is the mind of the parent corporation. For this reason the alleged "contract" is ineffectual and there is no change of ownership of the receivables alleged to have been assigned pursuant to such "contract." In these transactions the identity of the domestic company is lost and becomes merged in that of its owner and regardless of what is reflected in the books of the companies, so under the direction and control of the parent company, no change of title or ownership is effected by the daily reports which the Montana company sends the parent company of the day's business done in Montana wherein is listed, on schedules, the receivables that day purchased or acquired by the Montana company. In the business so transacted in Montana plaintiff Commercial Credit Company is but the *alter ego* of the parent Commercial Credit Company.

Section 5933, Revised Codes, provides: "The corporate powers, business, and property of all corporations formed under this title must be exercised, conducted and controlled by a board of not less than three nor more than thirteen directors, to be elected from among the holders of stock * * *. Directors of corporations for profit must be holders of stock therein in an amount to be fixed by the by-laws of the corporation," etc.

In *Scott* v. *Prescott*, 69 Mont. 540, 559, 223 Pac. 490, 496, this court, in referring to the above quoted provisions of section 5933, Revised Codes, said: "The result of the requirement is that, when the capital stock passes into the hands of a single person, the entity of the corporation, except so far as it is necessary to protect the rights of strangers, who deal with it through its

ostensible officers and agents, is entirely in abeyance, and its functions for the time being cease. So it is held by the current of authority." (Citing numerous authorities.)

In *Hanson Sheep Company* v. *Farmers' etc., State Bank*, 53 Mont. 324, 163 Pac. 1151, 1155, it was contended that the plaintiff is a mere colorable corporation—a shadow—organized and maintained by Hanson as a cloak or alias under which to conduct his own business and this court there exercised its power to examine into the facts "to ascertain the identity of the person who uses the name of the corporation for his own purposes and to fix liability for the ostensible corporate acts upon him."

In *Seymour* v. *Spring F. C. Ass'n*. 144 N. Y. 333, 39 N. E. 365, 26 L. R. A. 859, it is said: "The abstraction of the corporate entity should never be allowed to bar out and pervert the real and obvious truth."

In *Barnes* v. *Smith*, 48 Mont. 309, 137 Pac. 541, 543, we said "there are exceptional cases in which the courts refuse to recognize the corporate entity, as distinguished from the stockholders, if the refusal of such recognition is necessary in order to get at the truth. This statement applies especially to cases in which the corporation is used as a cloak for fraud, or to enable the owner of the stock to evade personal liability or to performance of a public duty." Here we are considering the *public duty* of the owner or user of these credits and receivables to pay to the state the lawful tax levied on the amount thereof having a business *situs* in Montana.

This court has not hesitated to ignore and disregard corporate entities where the ends of justice require it. (*In re Russell's Estate*, 102 Mont. 301, 59 Pac. (2d) 777.)

"The acquisition by one corporation of all the shares in another corporation has been thought to partake of the nature of a temporary consolidation, so long as such ownership continues." (2 Mechem's Modern Law of Corporations, 876.)

In *Gallatin N. G. Co.* v. *Public Service Comm.*, 79 Mont. 269, 284, 256 Pac. 373, 377, we correctly said: "There is abundant authority for holding that, when one corporation acquires

and holds all of the stock of another corporation, * * * the two corporations practically become merged, identical, the same to practical intent and purpose, and that the holding company owns, controls, and operates the other company and conducts its affairs and is the motivating power.''

In *Board of Railroad Commissioners* v. *Reed,* 102 Mont. 382, 385, 58 Pac. (2d) 271, 272, this court said: '' 'Contrary to popular opinion, mere schemes to evade law, once their true character is established, are impotent for the purpose intended. Courts sweep them aside as so much rubbish' (*Davis* v. *People,* 79 Colo. 642, 247 Pac. 801, 802), and 'no form of subterfuge or evasion will prevent the courts from going behind the form to the substance' (*Claypool* v. *Lightning Delivery Co.,* 38 Ariz. 262, 299 Pac. 126, 128; *Terminal Taxicab Co.* v. *Kutz,* 241 U. S. 252, 36 S. Ct. 583, 60 L. Ed. 984, Ann. Cas. 1916D, 765). This is the rule in this state even when those seeking to evade liability or responsibility form a corporation. (*Scott* v. *Prescott,* 69 Mont. 540, 223 Pac. 490) ''.

Solvent credits are clearly taxable in this state (secs. 1999, 2000, Rev. Codes, Ch. 130, Laws of 1937). Corporations, like individuals, are subject to such taxes. Section 7 of Article XII of the Constitution provides: ''The power to tax corporations or corporate property shall never be relinquished or suspended, and *all corporations in this state, or doing business therein,* shall be subject to taxation for state, county, school, municipal and other purposes, on real and personal property *owned or used* by them and not by this constitution exempted from taxation.''

. Commercial Credit Company owned no real estate in Montana and there is no provision of the Constitution that exempts from taxation any of the intangible property so ''owned or used by'' it in ''doing business'' in Montana. Thus does the above section of the Constitution authorize the state to tax ''all corporations in this state, or doing business therein'' on all ''corporate property'' including ''personal property owned or used by them.'' (Sec. 7, Art. XII, Const.)

Where intangible property such as solvent credits or accounts

██ receivable are created and used in the conduct of a business by the owner thereof in a state other than the owner's domicile, such property has, for taxing purposes, a *situs* in the state where such business is conducted irrespective of the domicile of the owner. (*State ex rel. Rankin* v. *Harrington*, 68 Mont. 1, 217 Pac. 681; *State* v. *Atlantic Oil Producing Co.*, 174 Okl. 61, 49 Pac. (2d) 534; *People* v. *Graves*, 250 App. Div. 149, 294 N. Y. Supp. 995; *Crane Co.* v. *Des Moines*, 208 Iowa 164, 225 N. W. 344, 76 A. L. R. 801; *Miami Coal Co.* v. *Fox*, 203 Ind. 99, 176 N. E. 11, 79 A. L. R. 333; *Jesse French Piano & Organ Co.* v. *City of Dallas*, Tex. Civ. App., 61 S. W. 942; *Household Finance Corporation* v. *State Board of Tax Appeals*, 119 N. J. L. 230, 196 Atl. 219; *Texas Land & Cattle Co.* v. *City of Fort Worth*, Tex. Civ. App., 73 S. W. (2d) 860, 861; *Starkey* v. *Carson*, 138 Fla. 301, 189 So. 385; *Duke Power Co.* v. *Hillsborough Tp., Somerset County*, 26 Atl. (2d) 713, 20 N. J. Misc. 240; *People* v. *McGraw Electric Co.*, 375 Ill. 241, 30 N. E. 903; *Mecklenburg County* v. *Sterchi Bros. Stores*, 210 N. C. 79, 185 S. E. 454; *Metropolitan Life Ins. Co.* v. *New Orleans*, 205 U. S. 395, 27 S. Ct. 499, 51 L. Ed. 853; *Wheeling Steel Corp.* v. *Fox*, 298 U. S. 193, 56 S. Ct. 773, 80 L. Ed. 1143; *First Nat. Bank* v. *Maine*, 284 U. S. 312, 52 S. Ct. 174, 76 L. Ed. 313, 77 A. L. R. 1401; *First Bank Stock Corp* v. *Minnesota*, 301 U. S. 234, 57 S. Ct. 677, 81 L. Ed. 1061, 113 A. L. R. 228; *Farmers' Loan & Trust Co.* v. *Minnesota*, 280 U. S. 204, 50 S. Ct. 98, 74 L. Ed. 371, 65 A. L. R. 1000.)

"The taxpayer who is domiciled in one state but carries on business in another is subject to a tax there measured by the value of the intangibles used in his business." (*Curry* v. *McCanless*, 307 U. S. 357, 368, 59 S. Ct. 900, 906, 83 L. Ed. 1339, 123 A. L. R. 162.)

In *Liverpool & London & Globe Ins. Co.* v. *Board of Assessors for Parish of Orleans*, 221 U. S. 346, 354, 31 S. Ct. 550, 553, 55 L. Ed. 762, L. R. A. 1915C, 903, the court said:

"When it is said that intangible property, such as credits on open account, have their *situs* at the creditor's domicile, the metaphor does not aid. Being incorporeal, they can have no

actual *situs*. But they constitute property; as such they must be regarded as taxable, and the question is one of jurisdiction.

"The legal fiction expressed in the maxim *mobilia sequuntur personam* yields to the fact of actual control elsewhere. And in the case of credits, though intangible, arising as did those in the present instance, the control adequate to confer jurisdiction may be found in the sovereignty of the debtor's domicile. The debt, of course, is not property in the hands of the debtor; but it is an obligation of the debtor, and is of value to the creditor, because he may be compelled to pay; and power over the debtor at his domicile is control of the ordinary means of enforcement. (*Blackstone* v. *Miller*, 188 U. S. [189], pages 205, 206, 23 S. Ct. 277, 47 L. Ed. [439], 444, 445.) Tested by the criteria afforded by the authorities we have cited, Louisiana must be deemed to have had jurisdiction to impose the tax. The credits would have had no existence save for the permission of Louisiana; they issued from the business transacted under her sanction within her borders; the sums were payable by persons domiciled within the state, and there the rights of the creditor were to be enforced. If locality, in the sense of subjection to sovereign power, could be attributed to these credits, they could be localized there. If, as property, they could be deemed to be taxable at all, they could be taxed there."

This case is of importance to the public. It concerns the revenue of the state. It involves the jurisdiction of the state to levy a tax on solvent credits valued at more than a half million dollars. The state of Montana levied the tax upon such intangible property pursuant to sections 1999, 2000 and 2000.1, Revised Codes of Montana, 1935, and the public officers and the public government of Silver Bow county was utilized by the state to determine the particular property and the value thereof to which the tax shall apply, and, when applied, to collect and to make distribution of the tax as is provided by law.

Thus does this case affect the revenue that must be raised by taxation for the support of government. Taxes are the means of distributing the cost of government in accordance with reason-

able rules of apportionment which equalize the burdens upon those who are benefited. They are the enforced proportional contributions exacted from the owner or user of property for the support of government. They constitute the ever-flowing blood stream that nourishes and maintains the state and its various departments. From this source is provided the revenue which enables the government and its departments, including this very court, to function.

In matters that so vitally affect the welfare of the state and its taxpayers extreme caution, diligence, thoroughness and vigilance are required of the public officers upon whom rests the responsibility of representing the interests of the state and in protecting the public revenue. This responsibility lies not alone with the executive department but it extends to the judiciary as well as the court being here called upon to ascertain and apply the correct rule to effect a solution of a question of lasting and vital importance to the state.

The correct solution of the problem presented is dependent first, upon a full and complete understanding of all the essential facts in the case and second, upon a proper understanding of the correct principle or rule of law applicable to such facts.

The record in this court contains no pleadings and no testimony. For the facts the court is referred to an agreed statement. In litigation involving only the private rights of private individuals or of private corporations much latitude is permitted respecting stipulations of the private parties for the statute says ''Any one may waive the advantage of a law intended solely for his benefit.'' (Sec. 8742, Rev. Codes.)

The instant case, however, concerns the interpretation and application of rules of law established for a public reason and vitally affecting the public revenue and the welfare of the state and as to private stipulations or private agreements concerning the application of such laws the statute says, ''But a law established for a public reason cannot be contravened by a private agreement.'' (Sec. 8742, Rev. Codes.)

In the agreed statement of facts it was stipulated: ''The

Delaware Company has no offices and does no business in the State of Montana.'' Whether or not the Delaware Company has offices in Montana and whether or not it does business in the state of Montana can be determined only by ascertaining the exact manner in which the business of Commercial Credit Company was and is conducted, handled and transacted in this state. If as a matter of fact the Delaware company had no offices and did no business in this state then, possibly, it could urge that ''movables follow the person'' which means that the *situs* of personal property, for purposes of taxation, in certain cases, is the domicile of the owner based on the legal maxim, "*mobilia sequuntur personam.*"

A very few additional facts, however, would render the above rule inapplicable and constitute an exception that has always been recognized, namely, that where the intangible property has acquired a business *situs* in another state, different from the domicile of the owner, then such personal property is taxable in the state where it has so acquired a business *situs* irrespective of the domicile of the owner.

To determine whether or not the business *situs* rule is applicable, the court must again know the true and complete facts as to how and for what length of time the business has been transacted in the state in question for the rule requires that there must have been a general or more or less continuous, course of business or series of transactions within the state where the property is physically located, as distinguished from mere sporadic and isolated transactions. (*Crane Co.* v. *Des Moines,* supra.)

In view of the fact that it is represented that on the first Monday in March, 1937, all the intangible property in question was then owned by the parent Commercial Credit Company, a Delaware corporation, the court is entitled to have presented to it the facts concerning the parent company's operations so far as they pertain to Montana. We should know whether the parent company ever operated or did business in Montana; whether it was ever licensed as a foreign corporation

to do business in Montana; if so, when was it so licensed; when did it commence doing business here; what kind of business did it do; what was the volume of such business; how was such business transacted and handled; did it file annual reports as to the business transacted as required by law; what do these annual reports show; did it formally withdraw from the state and if so when did it surrender its authority to do business in this state as a foreign corporation; what was the volume of business done by it in Montana at the time of its withdrawal and who took over the business when it finally withdrew; did it withdraw before or subsequent to the incorporation of the plaintiff Commercial Credit Company; how came the foreign corporation to own all the stock in the domestic corporation; has there ever been an appreciable time since the parent corporation first came into the state to do business that it has not regularly and habitually owned, held and used, in its business in Montana, large and varying amounts of conditional sales contracts, promissory notes and other solvent credits, contracted, executed, purchased, acquired and collected in Montana from Montana debtors? Most, if not all, of the above information could be obtained in five minutes from the records and files in the office of the secretary of state of Montana, yet none of such desired information is set forth in the agreed statement of facts herein.

To sustain a judgment for plaintiff on an agreed statement of facts, the statement must show *all the facts necessary to a recovery.* (*McCarthy* v. *Employers' F. Ins. Co.,* 97 Mont. 540, 37 Pac. (2d) 579, 97 A. L. R. 292, 298.) The plaintiff has not paid the tax levied on the assessed valuation of the receivables and, in the facts contained in the agreed statement we fail to see that plaintiff has made out a case or that it was entitled to prevail in the trial court. (*Miami Coal Co.* v. *Fox,* supra.)

Commercial Credit Company long has continuously used the offices of the registrar of motor vehicles, the various county clerks and recorders and sheriffs of the state of Montana in the conduct of its business in this state. These facts are notorious and known to all. Justice does not permit us to close our

eyes to these matters "for justice does not require that courts profess to be more ignorant than the rest of mankind." (*State ex rel. Kern* v. *Arnold,* 100 Mont. 346, 49 Pac. (2d) 976, 980, 100 A. L. R. 1071, quoting from 15 R. C. L. 1057.)

Our courts have at all times been open to both the plaintiff and to the parent company and neither company should now play hide and seek with the tax collector nor should they, by a Doctor Jekyll and Mr. Hyde existence, attempt to avoid contributing their proportionate and ratable share toward the support and maintenance of the departments of government which are essential to preserve their property and to enforce the obligations and intangibles in this state, in which they deal. These intangibles have a business *situs* in Montana. They are here taxable. Whether they are assessed as the property of Doctor Jekyll or as the property of Mr. Hyde there is but one and the same owner to pay the tax and the defendants are entitled to collect from either the parent company or its agent and *alter ego,* the plaintiff herein.

The judgment of the district court is reversed with directions to enter judgment in favor of defendants.

ASSOCIATE JUSTICES ANDERSON and ERICKSON concur.

MR. CHIEF JUSTICE JOHNSON:

I concur in the result reached by the majority for the sole reason that the agreed statement of facts shows that all the stock of plaintiff, a Montana corporation, is owned by Commercial Credit Company, a Delaware corporation, and that the former functions only for the business convenience and benefit of the latter.

This court said in *United States Gypsum Co.* v. *Mackey W. P. Co.,* 60 Mont. 132, 199 Pac. 249, 251: "It has been held by this court that where the stock of a corporation is owned by one person, whereby the corporation functions only for the benefit of such individual owner, the corporation and the individual should be deemed to be the same. (*Edwards* v. *Plains Light & Water Co.,* 49 Mont. 535, 143 Pac. 962; *Barnes* v. *Smith,* 48 Mont. 309,

137 Pac. 541; *Hanson Sheep Co.* v. *Farmers' & Traders' State Bank,* 53 Mont. 324, 163 Pac. 1151.)''

In *Barnes* v. *Smith,* supra, this court speaking through Mr. Chief Justice Brantly said that section 3833, Revised Codes of 1907 (now sec. 5933, Rev. Codes), requiring directors of a corporation for profit to be holders of its stock, required them to be bona fide owners thereof and said: ''The result of the requirement is that, when the capital stock passes into the hands of a single person, the entity of the corporation, except so far as it is necessary to protect the rights of strangers, who deal with it through its ostensible officers and agents, is entirely in abeyance, and its functions for the time being cease. So it is held by the current of authority.''

It is immaterial whether the sole owner of the corporate stock is an individual or another corporation. In either event the result is a practical merger of the corporation with its owner. (*Gallatin Natural Gas Co.* v. *Public Service Commission,* 79 Mont. 269, 256 Pac. 373; *Fulmer* v. *Board of Railroad Commissioners,* 96 Mont. 22, 28 Pac. (2d) 849.) There being in legal effect no separate contracting parties, the ''contract'' and other transactions relied upon to show plaintiff's transfer of the taxable property to its parent company are of no force, and plaintiff has failed to prove its case.

It seems fair to the learned district judge to state that the above determinative point was not raised by defendants either on trial or on appeal. Reference to the relationship was made in plaintiff's brief on appeal, but only upon the ground that ''under such a state of facts, closer scrutiny of the dealings between these two companies becomes necessary to determine their real nature.''

This is not a criticism of able counsel for appellants, whose attention was centered upon the question of the ownership of the taxed property as between the two assumedly separate, though related, corporations, nor do I consider counsel derelict as implied in the majority decision for not having recounted the complete life history of the two corporations at length in the

agreed statement of facts. The majority decision suggests also that by agreeing to the stipulation that "the Delaware Company has no offices and does no business in the State of Montana," counsel for defendants were attempting to waive a public right. The suggestion is not tenable. By an agreed statement of facts the parties stipulate facts and not law. As a matter of fact the Montana Company and not the Delaware Company maintained the offices and transacted the business in Montana; but as a matter of legal effect, under the circumstances shown the offices and the business were those of the Delaware Company. The agreed statement tried to effect no change in that respect, and effected none, as the result of this appeal amply demonstrates.

MR. JUSTICE MORRIS:

I dissent. The plaintiff is a Montana corporation qualified to do business only within this state. It maintains its head office at Butte and has offices in other cities within the state. All of its stock is owned by the Commercial Credit Company, a Delaware corporation which has no office in and does no business within the State of Montana. The plaintiff, hereinafter referred to as the Montana Company, is a complete and separate corporate entity from the Delaware corporation. Its business consists of the purchase from dealers and distributors of conditional sales contracts, notes and trust receipts arising out of sales by the dealers and distributors of automobiles and other products on a deferred payment plan. In furtherance of its business, the Montana Company entered into a contract with the Delaware corporation, wherein the latter agreed to purchase from the Montana Company such of its receivables as were acceptable to the Delaware corporation at a rate of discount stated in the contract. Pursuant to the terms of the contract and certain writings and letter agreements appearing in the record, the Montana Company, as it receives the conditional sales contracts, notes and trust receipts from the dealers and distributors, transfers and delivers them to the Delaware corporation at its office in San Francisco. After their transfer the Montana Company makes

collections on these receivables and then either remits the collections direct to the Delaware corporation, or credits them on any amount owed by the latter corporation to it.

The companies treated the transaction as an absolute sale, the Montana Company's books showing a sale and the Delaware corporation showing these receivables as assets on its balance sheets which are filed with the Securities and Exchange Commission, and with financial institutions for credit purposes. The income from these receivables is included by the Delaware corporation in its profits and loss statement filed with the Securities and Exchange Commission. After the transfer of these receivables to the Delaware corporation, they are kept by it at its San Francisco office, and the Montana Company cannot exercise, and has never exercised any control over them. The income form of the Delaware corporation also shows these receivables as the property of that company. The Delaware corporation, in borrowing money, puts up these receivables as security. Nothing on the books of either company, nor in their general method of doing business, suggests that either one considered the transaction as a loan or pledge, or anything but an absolute sale. Upon the full payment of any note transferred by the Montana Company to the Delaware corporation, it is the practice for the Montana Company to obtain the note when paid from the Delaware corporation for delivery to the maker in Montana. Under the contract, provision was made for a guaranty on the part of the Montana Company that the receivables would be paid, that is, the Montana Company agreed to make good on any that were not collectible up to two per cent, of the total amount transferred. It is agreed that the losses never exceeded the two per cent.

The gist of the controversy is well stated by the appellants in their brief: ''Whether or not the receivables in question were taxable in Silver Bow county, Montana, as property of the Montana Company, depends upon the nature of the transaction between the two companies. If the assignment and delivery of receivables from the Montana Company to the Delaware company under the agreed facts constituted a genuine, bona fide sale so

that title to the property passed directly from the Montana Company to the Delaware company, then the receivables were not taxable in Montana since they obviously were not within the taxing jurisdiction of Montana on the first Monday in March, 1937. If, however, despite the 'show and things' to the contrary, the transaction between the two companies actually amounted to a pledge of the receivables by the Montana Company to the Delaware Company to secure advances of money theretofore paid or thereafter to be paid by the parent company to its subsidiary, then the receivables in question did belong to the Montana Company on the above tax date and were subject to taxation in Montana. * * * Was the transaction a sale or a pledge?''

The general rule is that whether or not the transfer is a pledge or a sale is one of intention to be determined by an examination of the contract of transfer and the circumstances under which the transfer is made. (*Mercantile Trust Co.* v. *Kastor*, 273 Ill. 332, 112 N. E. 988.) No suggestion is raised here that there was any fraud in the arrangement existing between these two companies, nor is it suggested that there was any attempt at evasion of our Montana taxing laws by the arrangement. It is agreed that the two companies had a perfect right to enter into a sale and purchase agreement if they chose to.

No note is returned to the Montana Company nor does it become reinvested with title thereto unless the note is dishonored by non-payment. In such a case the Montana Company under its contract is obligated to redeem such note to the extent of two per cent. of the total amount of the notes sold to the Delaware company. This arrangement constitutes the Montana Company a seller of the notes with limited liability to their purchasers, the limit of its liability being two per cent. of the whole amount the Delaware Company has purchased from the Montana Company. After the title to the notes passes to the Delaware Company it is the owner thereof and taxable thereon. The Montana Company has nothing more to do with the notes except such as may be returned to it under the two per cent. guaranty. The arrangement between the Montana Company and the Delaware company

does not constitute a pledge as described by sections 8292 and 8293, Revised Codes, in any sense of the word. Clearly the Montana Company is a subsidiary of the Delaware company, but that fact does not make either liable for local taxes on respective assets.

The judgment of the trial court is correct and should be affirmed.

Rehearing denied March 24, 1944.

Note: Order of Supreme Court of Montana Allowing Appeal to Supreme Court of the United States filed June 20, 1944.